IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| MICHAEL NEGULIS<br>1695 Beaumont Ave. NW<br>Massillon, Ohio, 44646<br><br>　　　　　　　Plaintiff,<br><br>　　v.<br><br>STAHL/SCOTT FETZER COMPANY<br>c/o Statutory Agent, Corporate Creations<br>Network, Inc.<br>119 E. Court Street<br>Cincinnati, Ohio, 45202<br><br>　　-and-<br><br>JAMES ISAAC<br>1256 Marks Rd., APT # C,<br>Valley City, Ohio, 44280<br><br>　　-and-<br><br>AMBER TROST<br>5711 Mud Lake Road<br>Seville, Ohio, 44273<br><br>　　-and-<br><br>HEIDI ALTEN<br>749 Lakeside Dr,<br>Avon Lake, Ohio, 44012<br><br>　　　　　　　Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | CASE NO.<br><br>JUDGE:<br><br><br><br>**COMPLAINT FOR DAMAGES**<br><br>**Jury Demand Endorsed Herein** |

Plaintiff Michael Negulis, by and through undersigned counsel, as his Complaint against Defendants, states and avers the following:

## **PARTIES**

1. Negulis is a resident of the city of Massillon, county of Stark, state of Ohio.

2. Stahl/ Scott Fetzer Company ("Stahl") is a foreign limited liability company with its principal place of business located at 3201 W. Old Lincoln Way, Wooster, Ohio, 44691.

3. Isaac is an individual who, upon information and belief, resides in Valley City, Ohio.

4. At all times hereinafter mentioned, Isaac was a supervisor and/or manager for Stahl, who acted directly or indirectly in the interest of Stahl.

5. At all times relevant herein, Isaac supervised and/or controlled Negulis' employment with Stahl.

6. At all times relevant herein, Isaac acted directly or indirectly in the interest of Stahl in relation to its employees; was empowered to take tangible employment actions against Negulis; and was an "employer" within the meaning of Ohio R.C. § 4112.01(A)(2) and 29 CFR § 825.104, Family Medical Leave Act ("FMLA").

7. Trost is an individual who, upon information and belief, resides in Seville, Ohio.

8. Trost is, and at all times hereinafter mentioned, was the Senior Human Resource Generalist for Stahl, who acted directly or indirectly in the interest of Stahl.

9. At all times relevant herein, Trost controlled Negulis' employment with Stahl; was empowered by Stahl to take tangible employment action against Negulis; and was an "employer" within the meaning of Ohio R.C. § 4112.01(A)(2).

10. Alten is an individual who, upon information and belief, resides in Avon Lake, Ohio.

11. Alten is, and at all times hereinafter mentioned, was the Associate General Counsel for Stahl, who acted directly or indirectly in the interest of Stahl.

12. At all times relevant herein, Alten controlled Negulis' employment with Stahl; was empowered by Stahl to take tangible employment action against Negulis; and was an "employer" within the meaning of Ohio R.C. § 4112.01(A)(2).

## JURISDICTION AND VENUE

13. At all times referenced herein, Defendants hired citizens of the state of Ohio, contracted with companies and citizens in Ohio, and owned or rented property in Ohio. As such, the exercise of personal jurisdiction over Defendants comports with due process.

14. Negulis performed work in this judicial district, was paid by Defendants for work performed in this district and/or was hired out of this district.

15. This cause of action arose from or relates to the contacts of Defendant with Ohio residents, thereby conferring specific jurisdiction over Defendants.

16. This Court has jurisdiction over the subject matter of this action under 29 U.S.C. § 2617 and 28 U.S.C. § 1331.

17. This Court has supplemental jurisdiction under 28 U.S.C. § 1367 over Negulis' state law claims because those claims derive from a common nucleus of operative facts.

18. Venue is proper in this District because Defendant does a sizeable portion of its business in this District, and many of the wrongs herein alleged occurred in this District.

## COVERAGE

19. At all times referenced herein, Stahl was an employer within the meaning of 29 U.S.C. § 2611(4)(A)(i)-(iii) of the Family Medical Leave Act ("FMLA"), in that Defendant, at all times thereinafter mentioned, engaged in commerce or in any industry or activity affecting commerce and employed fifty or more employees for each working day during each of 20 or

more calendar workweeks in the current or preceding calendar year. 29 U.S.C. § 2617, *et seq*.

## FACTUAL ALLEGATIONS

11. Negulis is a former employee of Stahl.

12. Negulis was initially hired as a temporary employee of Stahl in or around March of 2018 through a third-party staffing agency, Aerotech.

13. During his employment with Aerotech, Negulis worked for Stahl as a "Painter I."

14. As a "Painter I," Negulis was responsible for painting industrial and automotive equipment.

15. Negulis received no discipline from Stahl during his employment through Aerotech.

16. Stahl had no issues or concerns with the quality of Negulis' work during his employment through Aerotech.

17. In or around June of 2018, Stahl hired Negulis directly from Aerotech and promoted him to the position of "Painter II."

18. Stahl hired Negulis and promoted him to "Painter II" because Stahl was satisfied with the quality of Negulis' work.

19. At the time Negulis was hired by Stahl, he was married.

20. Negulis is the father to a minor child who suffers from severe autism.

21. As a result of Negulis' child's autism, Negulis' child is and was considered disabled withing the meaning of Ohio R.C. § 4112.01(A)(13).

22. During 2018, Negulis and his wife went through a divorce.

23. In or around January of 2019, Negulis won sole custody of his autistic child.

24. In March of 2019, Negulis submitted a request for intermittent FMLA leave through Stahl's third-party administrator, Unum, so he could care for his autistic child ("FMLA Request").

25. Unum approved Negulis' FMLA Request.

26. Shortly after Negulis' FMLA Request was approved, Stahl hired Isaac as its Plant Manager.

27. Between Isaac's hire and January of 2020, Negulis complained to Isaac about various safety issues that he believed Isaac would correct.

28. Negulis complained to Isaac about dangerous tools being left out in a hazardous manner.

29. Negulis complained to Isaac that other employees locked up tools he and others needed to perform their jobs safely and correctly.

30. Negulis complained to Isaac that Stahl had failed to provide him and other painters with OSHA required personal protective equipment ("PPE"), such as gloves and adequate face coverings.

31. Isaac failed to address any of Negulis' complaints about safety at Stahl.

32. Negulis would report to Isaac whenever he needed to utilize his FMLA leave.

33. Isaac and several of Negulis co-workers complained about Negulis and his attendance at work when he used his FMLA leave.

34. Isaac questioned Negulis' use of his FMLA leave and suggested to Negulis that he was working "less than part-time."

35. Isaac complained to Negulis that because of his use of his FMLA leave, Negulis was "never [at work]."

36. On one or more occasions, Isaac questioned whether Negulis "really" needed time off from work to care for his disabled child.

37. On one occasion, Isaac characterized Negulis' need to use FMLA leave to care for his disabled child as a "just a babysitter issue."

38. Shortly after learning of Negulis' utilization of FMLA leave to care for his disabled child, Isaac began to nitpick and criticize of Negulis' work.

39. Shortly after learning of Negulis' utilization of FMLA leave to care for his disabled child, Isaac began to fabricate problems with the quality of Negulis' work.

40. Isaac did not fabricate quality issues for employees who were not utilizing FMLA leave.

41. Isaac fabricated purported quality issues in connection with Negulis' work because Negulis was utilizing FMLA leave.

42. Isaac did not fabricate quality issues for employees who were not associated with a disabled family member.

43. Isaac fabricated purported quality issues in connection with Negulis' work because Negulis associated with his disabled child.

44. Shortly after learning of Negulis' utilization of FMLA leave to care for his disabled child, Isaac intentionally exaggerated and mischaracterized any and all imperfections he could find in Negulis' work in order to create a narrative that Negulis' work product was deficient.

45. Isaac did not intentionally exaggerate and mischaracterize any and all imperfections he could find in the work of employees who were not utilizing FMLA leave.

46. Isaac intentionally exaggerated and mischaracterized any and all imperfections he could find in Negulis' work because Negulis was utilizing FMLA leave.

47. Isaac did not intentionally exaggerate and mischaracterize any and all imperfections he could find in the work of employees who were not associated with a disabled family member.

48. Isaac intentionally exaggerated and mischaracterized any and all imperfections he could find in Negulis' work because of Negulis' relationship with his disabled child.

49. In late October of 2019, Isaac gave Negulis a written warning based on the various fake and exaggerated criticisms Isaac had previously levied against Negulis about the quality of his work.

50. In or around November of 2019, Isaac told Negulis that he was "clearly distracted" by the needs of his disabled child and that Negulis should consider letting his ex-wife take care of his child so Negulis could "focus on [his] work."

51. Isaac's remarks to Negulis that he should have his wife care for his disabled child so he could "focus" on his work at Stahl was an implicit demand that Negulis stop utilizing his FMLA leave.

52. Negulis responded to Isaac by telling him he could not allow his ex-wife to care for his disabled child because doing so would be dangerous for his child.

53. In or around December of 2019, Isaac responded to Negulis' refusal to have his ex-wife care for his disabled child by giving Negulis a final written warning.

54. As part of the final written warning, Negulis was to be suspended for three days without pay in early January, 2020.

55. The final written warning Isaac gave Negulis stated that Isaac had found runs, dirt, and mottling in the clear coat of utility body doors that Negulis had worked on ("Utility Doors").

56. Negulis had only sprayed the base coat of the Utility Doors.

57. Negulis did not paint the clear coat that the final written warning referenced.

58. Another painter named Brad Stanley had painted the clear coat on the Utility Doors.

59. There were no runs, dirt, and/or mottling in the base coat of the Utility Doors.

60. Negulis protested receiving a final written warning for quality issues in the work of another Painter.

61. Isaac ignored Negulis' complaints.

62. Subsequently, Negulis called Stahl's human resources office and spoke with a human resources employee named Amber Trost.

63. Negulis complained to Trost that he believed that Isaac was singling him out and mistreating him because of his use of FMLA to take care of his disabled child.

64. Negulis quoted some of Isaac's statements regarding Negulis' child and FMLA use to Trost in of support his allegations of retaliation and discrimination by Isaac.

65. Trost instructed Negulis to contact "corporate" with his complaints.

66. Subsequently, Negulis called Stahl's corporate office and spoke with Alten.

67. During his telephone conversation with Alten, Negulis complained that he was being targeted by Isaac for unmerited write-ups and discipline because he was using FMLA to take care of his disabled child.

68. During his telephone conversation with Alten, Negulis complained that he could not afford to be suspended.

69. During his telephone conversation with Alten, Negulis told Alten that he was being held to a different standard by Isaac than other painters.

70. During his telephone conversation with Alten, Negulis told Alten that he was being disciplined for quality issues in the work of other painters.

71. During his telephone conversation with Alten, Negulis complained that Stahl had failed to provide him and other painters with PPE and that Isaac had refused to do anything about it.

72. In response to Negulis' complaints, Alten told Negulis that she would conduct an investigation.

73. Shortly after the Christmas holiday, Negulis attempted to follow up with Alten, but he had to leave her a voicemail.

74. Alten followed up with Negulis by text message on or about January 2, 2020.

75. Alten told Negulis that her investigation was moving slowly because people were out for the holidays.

76. Alten further advised Negulis that his suspension would be delayed until she completed her investigation.

77. On Wednesday, January 8, 2020, Alten travelled to the facility that Negulis worked in.

78. During her visit to Negulis' worksite, Alten spoke with Isaac.

79. Upon information and belief, Alten disclosed to Isaac that Negulis had complained that Isaac had been discriminating against him because of his disabled child and use of FMLA leave.

80. Upon information and belief, Alten disclosed to Isaac that Negulis had complained that Isaac had failed to address Negulis' complaints about the lack of PPE in the worksite.

81. Alten failed to conduct a thorough investigation.

82. Upon information and belief, Stahl maintains a policy regarding the investigation of allegations of discrimination ("Investigation Policy").

83. Pursuant to Stahl policy, an investigation of discrimination or harassment should include interviewing the complainant.

84. Pursuant to Stahl policy, an investigation of discrimination or harassment should include interviewing the subject of the complaint.

85. Pursuant to Stahl policy, an investigation of discrimination or harassment should include interviewing the subject of the reported discrimination.

86. Pursuant to Stahl policy, an investigation of discrimination or harassment should include interviewing witnesses to the reported discrimination.

87. Pursuant to Stahl policy, an investigation of discrimination or harassment should include getting a written statement from the complainant.

88. Pursuant to Stahl policy, an investigation of discrimination or harassment should include getting a written statement from the subject of the complaint.

89. Pursuant to Stahl policy, an investigation of discrimination or harassment should include getting a written statement from the subject of the reported discrimination.

90. Upon information and belief, Alten's "investigation" was limited to interviewing Negulis and interviewing Isaac.

91. Upon information and belief, Alten did not review any documents as part of her "investigation."

92. Upon information and belief, Alten did not interview any witnesses as part of her "investigation."

93. Alten did not obtain a written statement from Negulis.

94. Alten did not obtain a written statement from Isaac.

95. Alten did not obtain a written statement from any witnesses.

96. On January 17, 2020, Stahl proceeded with suspending Negulis from January 20, 2020 through January 22, 2020.

97. As justification for suspending Negulis, Stahl did not cite to any issues with the Utility Doors Negulis had worked on in December of 2019, but to a new issue concerning Negulis' allegedly painting an "L-box" the wrong color in January of 2020.

98. Subsequently, Negulis sent Alten pictures of mistakes in the work of another painter named Melanie that did not result in Melanie being disciplined for the purpose of further demonstrating that he was being singled out.

99. Alten responded to Negulis' photos by telling him to talk to Trost.

100. Frustrated that Alten appeared to be discarding his complaints of disparate treatment, Negulis responded to Alten by stating that he would be contacting the Equal Employment Opportunity Commissions ("EEOC"), the Environmental Protection Agency ("EPA"), and the Occupational Safety and Health Administration ("OSHA") regarding his working conditions at Stahl.

101. On January 18, 2020, Negulis sent Alten photos of his hands covered in paint via text message and complained "I got off Friday morning, it's [sic] 11am on saterday [sic]. This industrial paint will stay on my hands for weeks. Why, because I have to perform my job function [sic]…without the equipment to do so safely."

102. Negulis took FMLA leave on Sunday, January 19, 2020.

103. Alten responded to Negulis on Monday, January 20, 2020, by telling him that her boss, David Lamb, would be reaching out to Negulis to discuss his concerns "later this week."

104. Lamb is the Vice President and General Counsel for Stahl.

105. Negulis was scheduled to return to work on January 23, 2020 after serving his suspension.

106. Prior to Negulis' return to work, Trost sent Negulis an email and told him that he could not return to work until she talked to him first.

107. Trost and Isaac called Negulis on or about January 21, 2020.

108. During her phone call with Negulis, Trost told Negulis that she knew that Negulis had spoken with Alten and that "unfortunately, there is not much [Alten] can do because she is off-site."

11

109. Trost then told Negulis that she and Isaac wanted discuss Negulis' concerns.

110. Negulis responded to Trost and Isaac by stating that he was looking for an attorney because he believed he was being discriminated against and retaliated against "because you guys don't like that I am taking FMLA to take care of my son."

111. Negulis complained to Trost and Isaac against about not having PPE readily available when he worked.

112. Trost responded to Negulis by stating "you are serving out your suspension…we could have terminated you."

113. Trost's statement that "we could have terminated you" was an explicit threat to Negulis to stop complaining about discrimination and retaliation at Stahl.

114. Trost's statement that "we could have terminated you" was an explicit threat to Negulis to stop complaining about the lack of PPE for Painters at Stahl.

115. Negulis returned to work during the evening of January 23, 2020.

116. There were no new incidents or issues concerning the quality of Negulis' work between January 23, 2020, and February 3, 2020.

117. On February 3, 2020, Isaac terminated Negulis.

118. As justification for terminating Negulis, Isaac pointed to the same incident that Stahl had used to justify suspending Negulis, i.e, that Negulis had painted an "L-box" the wrong color on January 9, 2020.

119. Defendants' stated reason for terminating Negulis was a pretext for discrimination on the basis of Negulis' association with his disabled child.

120. Defendants' stated reason for terminating Negulis was a pretext for retaliation against Negulis because he took FMLA leave.

121. Defendants' stated reason for terminating Negulis was a pretext for retaliation against Negulis because he made complaints about Stahl's failure to provide him and other painters with PPE.

122. Defendants' stated reason for terminating Negulis was a pretext for retaliation against Negulis because he made complaints about Isaac's discriminatory conduct towards Negulis.

123. Upon information and belief, Isaac, Trost, and Alten participated in the decision to terminate Negulis.

124. As a result of Defendants' conduct, Negulis has suffered and continues to suffer damages

### COUNT I: RETALIATION IN VIOLATION OF THE FMLA.
### (Asserted against Stahl and Isaac Only).

125. Negulis restates each and every prior paragraph of this Complaint, as if it were fully restated herein.

126. During his employment with Stahl, Negulis utilized FMLA leave.

127. After Negulis began taking FMLA leave, Isaac treated him differently than other employees who had not taken FMLA leave by unfairly nit-picking and criticizing Negulis' work for non-existent, made-up, or exaggerated reasons and by subjecting Negulis to discipline for purported quality issues in his work that Isaac knew was non-existent, made-up, or exaggerated.

128. After Negulis began taking FMLA leave, Isaac subjected Negulis to repeated offensive questioning and ridicule regarding his use of FMLA leave.

129. After Negulis utilized his qualified FMLA leave, Stahl and Isaac retaliated against him by suspending his employment.

130. After Negulis utilized his qualified FMLA leave, Stahl and Isaac retaliated against him by terminating his employment.

131. Stahl and Isaac willfully retaliated against Negulis in violation of U.S.C. § 2615(a).

132. As a direct and proximate result of Stahl and Isaac's wrongful conduct, Negulis is entitled to all damages provided for in 29 U.S.C. § 2617, including liquidated damages, costs, and reasonable attorneys' fees.

### COUNT II: ASSOCIATIONAL DISABILITY DISCRIMINATION IN VIOLATION OF R.C. § 4112.02, *et seq*.
### (Asserted against Stahl and Isaac Only).

133. Negulis restates each and every prior paragraph of this Complaint, as if it were fully restated herein.

134. Ohio law prohibits "excluding or otherwise denying equal jobs or benefits to a qualified individual because of the known disability of an individual with whom the qualified individual is known to have a relationship or association.

135. At all times referenced herein, Negulis was qualified for the position of Painter II.

136. As evidenced by Isaac's multiple inappropriate comments to Negulis, Stahl and Isaac terminated Negulis based on Isaac's unfounded belief that Negulis had been or would be distracted from performing his job duties due to the needs of his disabled child.

137. By terminating Negulis because of his association with his disabled child, Stahl and Isaac have violated R.C. § 4112.02, entitling Negulis to the remedies available pursuant to R.C. § 4112.99.

### COUNT III: UNLAWFUL RETALIATION IN VIOLATION OF OHIO REVISED CODE §4112.02(I).
### (Asserted against all Defendants)

138. Negulis restates each and every prior paragraph of this Complaint, as if it were fully restated herein.

139. Pursuant to R.C. §4112.02(I), it is an unlawful discriminatory practice "to discriminate in any manner against any other person because that person has opposed any unlawful discriminatory practice defined in this section…"

140. Negulis opposed disability discrimination when he made complaints to Trost, Alten, and Isaac that he believed he was being discriminated against because of his disabled child.

141. Defendants unlawfully retaliated against Negulis for opposing discrimination by terminating his employment.

142. As a direct and proximate cause of Defendants' retaliatory conduct, Negulis suffered and will continue to suffer damages.

### COUNT IV: RETALIATION IN VIOLATION OF OHIO WHISTLEBLOWER STATUTE R.C. § 4113.52.
### (Asserted Against Defendant Stahl Only).

143. Negulis restates each and every prior paragraph of this Complaint, as if it were fully restated herein.

144. 29 CFR 1915.35(b)(9) requires that workers face, eyes, head, hands, and all other exposed parts must be protected during the handling of highly volatile paints.

145. The failure to comply with the requirements of 29 CFR 1915.35(b)(9) creates an imminent risk of physical harm to employees.

146. OSHA requires that workers wear respirators when working with paints and tank coatings mixed with or dissolved in volatile, toxic, or flammable solvents, even when mechanical ventilation is in use (29 CFR 1915.35(a) and (b)).

147. The failure to comply with the requirements of 29 CFR 1915.35(a) and (b) creates an imminent risk of physical harm to employees.

148. During his employment, Negulis made verbal and written reports to Stahl regarding its failure to comply with applicable OSHA regulations., i.e, Stahl's failure to provide protective equipment and respirators as required by 29 CFR 1915.35 *et seq*.

149. Stahl retaliated against Negulis by terminating his employment based on his complaints regarding conduct that was illegal and/or created a danger to Stahl employees.

150. Stahl's termination of Young was in violation of R.C. § 4113.52, *et seq*.

151. As a direct and proximate cause of Stahl's conduct, Young suffered and will continue to suffer damages.

## **DEMAND FOR RELIEF**

WHEREFORE, Plaintiff Michael Negulis respectfully request relief against Defendants as set forth below:

a. Awarding damages, including actual, compensatory, non-economic, general, special, incidental, statutory, punitive, treble, liquidated, and consequential to Negulis in an amount to be determined at trial;

b. Awarding Plaintiff damages for the mental anguish and distress caused by Defendants' retaliatory conduct;

c. Issuing a declaratory judgment that the practices complained of herein are unlawful under the FLSA, 29 U.S.C. §§ 201 *et seq* and Ohio R.C. §4112.02, *et seq*;

d. Issuing an injunction prohibiting Defendants from continued unlawful practices, policies and patterns set forth herein;

e. Awarding pre-judgment and post-judgment interest as provided by law;

f. Awarding reasonable attorneys' fees and costs; and

g. Awarding such other and further relief that this Court deems appropriate.

Respectfully submitted,

*/s/Chris P. Wido*
Chris P. Wido (0090441)
**THE SPITZ LAW FIRM, LLC**
25200 Chagrin Boulevard, Suite 200
Beachwood, Ohio 44122
Phone: (216) 291-4744
Fax:    (216) 291-5744
Email: chris.wido@spitzlawfirm.com

*Attorney for Plaintiff Michael Negulis*

## JURY DEMAND

Plaintiff Michael Negulis demands a trial by jury by the maximum number of jurors permitted.

*/s/ Chris P. Wido*
Chris P. Wido (0090441)
**THE SPITZ LAW FIRM, LLC**

*Attorney for Plaintiff Michael Negulis*